UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
ERIC BRAHMS,                          :
                          Plaintiff,  :          MEMORANDUM & ORDER
                                      :
                                      :          12-CV-5611 (ENV)
        -against-                     :
                                      :
RICHARD CARVER and                    :
THOMAS MARCANO,                       :
                                      :
                        Defendants.   :
-------------------------------------------------------x

VITALIANO, D.J.,

        Plaintiff Eric Brahms commenced this diversity action[1] against defendants

Richard Carver and Thomas Marcano, asserting claims of defamation and breach

of contract. Defendants now move to dismiss the complaint pursuant to Federal

Rule of Civil Procedure 12(b)(6). For the reasons that follow, the motion is granted

in its entirety.

## Background

        The following facts are taken from the amended complaint, as well as other

evidence of which the Court may take notice on a Rule 12(b)(6) motion, and are

assumed to be true for purposes of that motion.

        Brahms's claims are based on comments made online on the Vintage Rolex

Forum ("VRF"), an internet forum where users discuss various topics related to

---

[1] The matter in controversy exceeds $75,000, and is between citizens of different states:
Brahms is a citizen of Connecticut, Carver is a citizen of Texas, and Marcano is a citizen of
New York. (Compl. ¶¶ 2-4); 28 U.S.C. § 1332(a)(1).

vintage Rolex watches. (Compl. at ¶ 8.) VRF is owned and operated by Carver and moderated by Marcano, and it is hosted by Network54.com ("Network54"), an internet website hosting company that is not a party to this action. (*Id.* at ¶¶ 9-11). Brahms is in the business of buying, refurbishing and selling vintage Rolex watches. (*Id.* at ¶ 7.) In April 2011, he registered a free account on VRF under the username "Beever." (*Id.* at ¶ 11.) Linked to Brahms' account were his full name and a Yahoo.com email address. (*Id.* at ¶ 13.) As the moderator and operator of VRF, Marcano and Carver had access to this information.[2]

The events in dispute occurred in the course of several online conversations on VRF. Between October 17 and 19, 2011, Brahms (posting under the name "Beever") participated in a heated discussion on VRF during which he accused certain eBay sellers of marketing and selling what he deemed to be either fake Rolexes or fake authentication certificates for Rolexes, and accused other VRF members of being in cahoots with these fraudsters. (*See* Affirmation of Matthew G. Coogan, dated Feb. 15, 2013 ("Coogan Aff."), Aff. Ex. 3, at 7-13.) On October 19, 2011, Marcano joined the conversation under the username "tomvox1," and admonished Beever (Brahms) for making baseless allegations against other users, advising him to "[s]tep away from the keyboard for a few hours/days and get your facts lined up if you are going to continue to post on this matter." (*Id.* at 8.) Brahms and Marcano went on to trade insults over the next several hours, with other VRF

---

[2] Defendants dispute that they had access to Brahms's personal information, but, for purposes of this motion, the Court must assume the truth of this fact as alleged.

members weighing in as well. (*Id.* at 14-18.) It is noteworthy that throughout the course of the conversation, several users referred to "Beever" as "Eric" or "EB." (*See, e.g., id.* at 8, 16.) It is unclear how or when those users learned Brahms's real first and/or last name.

In a separate VRF discussion thread, also proceeding on October 19, 2011, a user named "Morgan King" posted the following:

> "Hey Beever dude:
>
> Honest Question:
> Are you the seller on ebay known as ericbee who listed these items on ebay?"
>
> Is your email address:
> ericbrahms@gmail.com
>
> as well as
>
> edouble141@aol.com ????
>
> Is this your listing?
>
> http://www.ebay.com/itm/130578281367

(Coogan Aff. Ex. 4 at 1.) Brahms confirmed that the email addresses and eBay name were his, adding "Nice work." [3] (*Id.* at 2.) Other VRF users went on to intimate that Brahms had sold questionable Rolexes on eBay. (*See id.* at 2-3.)

Later that evening, in a different discussion thread, Marcano (posting as tomvox1) demanded an apology from Brahms for accusations he made against

---

[3] Brahms asserts, but without plausible factual support, that "the only way in which this user could have received this information is from a person who is associated with the forum (and who had access to this information), such as defendant Carver or defendant Marcano." (Mem. in Opp. at 19.)

Marcano in the earlier exchange, particularly Brahms' statement that Marcano was "duping the innocent." (Coogan Aff. Ex. 5 at 1.) Specifically, Marcano wrote "I would like an apology for this, Beever/Eric Brahms/edouble141/ericbee . . . ." (*Id.*, Compl. at ¶ 20.) Carver, weighing in for the first time, agreed that Marcano was owed an apology. (Coogan Aff. Ex. 5 at 1.) In a lengthy post, Brahms responded with numerous examples of slights that Marcano had made against him, and demanded his own apology for these "extremely condescending remarks." (*Id.* at 3-4.) Carver then responded that "Mr. Beever is no longer with us," indicating that Brahms had been banned from the forum. (*Id.* at 4.)

The following month, on November 18, 2011, Brahms was indicted in Supreme Court, New York County, along with 27 other individuals, for his role in an alleged credit card counterfeiting scheme. According to the indictment, the conspirators stole credit card numbers in restaurants and used them to create forged credit cards, which they then used to purchase goods. (*See* Coogan Aff. Ex. 6 (Indictment).) Brahms was charged with participation in a criminal enterprise, petit larceny, criminal possession of a forged instrument in the second degree, and grand larceny in the fourth degree. (*Id.*) On November 18, 2011, the *New York Times* published an article about the indictment, accompanied by a photo of Brahms in Manhattan Supreme Court. (*See* Coogan Aff. Ex. 7.) On November 20, 2011, the *Daily News* published an article that described Brahms's arrest and reported that he had been charged with fencing high-end goods bought by individuals using counterfeit credit cards. (*See* Coogan Aff. Ex. 8.)

The news of Beever's troubles did not escape notice on VRF. On December 5, 2011, a user identified as "Frank" posted on VRF, "Eric Brahms aka Beever – Arrested for Fraud, Fencing Jewelry & Rolex," and linked to the two news articles. (Compl. ¶ 22-24.) Marcano responded that Brahms was a "pathetic and unhinged individual and in the end just another 2-bit thief and counterfeiter."[4] (Compl. ¶ 24.) In the ensuing discussion, someone pointed out that the allegations against Brahms did not appear to relate in any way to Rolexes. (Coogan Ex. 9 at 2.) Marcano responded, "Hey, he might not be guilty in the long run. But he's still a first class a@@hole." (Id.)

Nearly a year later, on September 27, 2012, Brahms sent Carver an email requesting that the negative posts about him be removed from the forum. (Compl. ¶ 29.) He received no response. (Id.) On November 12, 2012, Carver wrote a post on VRF entitled "Whatever happened to the Eric Brahms case?" (Id. ¶ 31; Coogan Aff. Ex. 10.) Carver sought legal advice from the forum, apparently in response to a November 1, 2012 letter from Brahms' attorney demanding removal of the offending postings and threatening suit. Carver's post included a link to the December 5, 2011 thread. (Complaint ¶ 31; Coogan Aff. Ex. 10, 11.)

Brahms filed the complaint in this case on November 14, 2012. On February 20, 2013, while the parties were in the process of briefing this motion to dismiss, Brahms pleaded guilty to charges of grand larceny in the fourth degree and criminal possession of a forged instrument in the second degree. (*See* Coogan

---

[4]    This post has since been deleted from VRF.

Affirmation in Further Support of Defendants' Motion to Dismiss ("Coogan Reply Aff.") Ex. 1 (transcript of Brahms' guilty plea allocution.))

After they were posted, the comments about Brahms—along with the links to the relevant news articles—became available to anyone conducting an internet search for his name. (Compl. ¶ 28). Brahms alleges that these comments contain untrue statements of fact and have eliminated his ability to buy or sell Rolex watches or parts to anyone anywhere in the world. He alleges further that these posts have also caused him to be rejected by landlords, banks, and brokerage accounts, and banned by PayPal and eBay. (*Id.* at 33.)

<u>Standard of Review</u>

Under Federal Rule of Civil Procedure 8(a)(2), a complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This rule does not compel a litigant to supply "detailed factual allegations" in support of his claims, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007), "but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 667 (2009). "A pleading that offers 'labels and conclusions' . . . will not do." *Id.* (quoting *Twombly*, 550 U.S. at 555). "Nor does a complaint suffice if it tenders 'naked assertions' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

A complaint must be dismissed under Rule 12(b)(6) if it does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible

on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Determining plausibility is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 1950. That said, the factual allegations are paramount—"a complaint need not pin plaintiff's claim for relief to a precise legal theory" nor provide "an exposition of his legal argument." *Skinner v. Switzer*, 131 S. Ct. 1289, 1296 (2011). In analyzing well-pled facts, a court must accept as true all allegations in the complaint and draw all reasonable inferences in favor of the pleader. *See Gorman v. Consol. Edison Corp.*, 488 F.3d 586, 591-92 (2d Cir. 2007).

A court may consider on a Rule 12(b) motion, in addition to the pleading itself, documents that are annexed to or referenced in the complaint, documents that the plaintiff relied on in bringing the suit, and matters of which judicial notice may be taken. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002) (citations omitted); *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000). In this case, the Court will look to Network54's "Terms of Use" (the "Network54 TOU" or the "TOU"), (*see* Coogan Aff. Ex. 2), the *Daily News* and *New York Times* articles that mentioned Brahms (*see* Coogan Aff. Exs. 8 and 9), and the relevant VRF discussion threads, (*see* Coogan Aff. Exs. 5 and 6), all of which are referenced in the complaint and provided in full by defendants with their briefing, notwithstanding that Brahms declined to attach these documents to his complaint. *See Holowecki v. Fed. Express*

7

*Corp.*, 440 F.3d 558, 565-66 (2d Cir. 2006) ("'[w]hen a plaintiff chooses not to attach to the complaint . . . a [document] upon which [he] solely relies and which is integral to the complaint, the court may nevertheless take the document into consideration in deciding the defendant's motion to dismiss . . . .'") (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995), *aff'd*, 552 U.S. 389 (2008)).

Discussion

## I.    Defamation

Brahms claims defamation based on Marcano's December 5, 2011 statement calling him a "2-bit thief and counterfeiter," and Carver's subsequent republication of the post containing that statement the following year.  The parties agree that New York law applies to the defamation claim.[5]

"Defamation is the injury to one's reputation either by written expression, which is libel, or by oral expression, which is slander." *See Idema v. Wager,* 120 F. Supp. 2d 361, 365 (S.D.N.Y. 2000), *aff'd* 29 Fed. Appx. 676 (2d Cir. 2002).  To state a claim for defamation under New York law, Brahms must allege "1) a false statement, 2) that was published without privilege or authorization to a third party, 3) constituted fault as judged by, at a minimum, a negligence standard, and 4) either caused a special harm or constituted defamation per se." *McNamee v. Clemens,* 762

---

[5]    *See Merrill Lynch Interfunding, Inc. v. Argenti,* 155 F.3d 113, 121 n. 5 (2d Cir. 1998) ("Jurisdiction in this case is premised on diversity, and the parties both present arguments based on New York law, the law of the forum state.  It is therefore appropriate for this Court to apply New York law.")

F. Supp. 2d 584, 599-600 (E.D.N.Y. 2011); *see also Dillon v. City of New York*, 261 A.D.2d 34, 38, 704 N.Y.S.2d 1 (1st Dep't 1999)).

Crucially, only a provable statement of fact is actionable as defamation. *See McNamee*, 762 F. Supp. 2d at 600; *Gross v. New York Times Co.*, 82 N.Y.2d 146, 153, 603 N.Y.S.2d 813, 623 N.E.2d 1163 (1993) ("Since falsity is a necessary element of a defamation cause of action and only 'facts' are capable of being proven false, 'it follows that only statements alleging facts can properly be the subject of a defamation action.'"). It is axiomatic that statements of opinion cannot constitute actionable defamation. *Egiazaryan v. Zalmayev*, 880 F. Supp. 2d 494, 503 (S.D.N.Y. 2012) (statements of opinion "receive 'absolute protection' under the New York Constitution") (quoting *Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163, 178 (2d Cir. 2000)). Nor can "[l]oose, figurative or hyperbolic statements, even if deprecating the plaintiff" be the subject of a defamation action. *Dillon*, 261 A.D.2d at 38 (citation omitted); *see also Gross*, 82 N.Y.2d at 152 ("rhetorical hyperbole" is not actionable). The dispositive inquiry is whether a reasonable reader could have concluded that the statements were conveying facts about the plaintiff. *Gross*, 82 N.Y.2d at 152-53. Set in this footing, Marcano argues that his statement was not one of fact, but rather a protected expression of opinion, and that any reasonable reader would have interpreted it as such.

"Distinguishing between assertions of fact and nonactionable expressions of opinion has often proved a difficult task." *Brian v. Richardson*, 87 N.Y.2d 46, 51, 660 N.E.2d 1126, 637 N.Y.S.2d 347 (1995). The New York courts have set out the

following factors to consider in making the distinction: "(1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to 'signal . . . readers or listeners that what is being read or heard is likely to be opinion, not fact.'" *Id.* (quoting *Gross*, 82 N.Y.2d at 153). In weighing these factors, "the court should look to the over-all context in which the assertions were made and determine on that basis 'whether the reasonable reader would have believed that the challenged statements were conveying facts about the libel plaintiff.'" *Id.* (quoting *Immuno AG. v Moor-Jankowski*, 77 N.Y.2d 235, 254, 567 N.E.2d 1270 (1991)).

The upshot is that context is key. In *Gross*, for example, the allegedly defamatory statements were made in an investigative article in the news section of the *New York Times*, a context which the Court of Appeals held to suggest that the statements were factual in nature. *Gross*, 82 N.Y.2d at 155-56. By contrast, New York courts have held the following contexts to be strongly suggestive that any alleged statements were opinion or allegations, rather than fact: the editorial page of a newspaper, *Brian*, 87 N.Y.2d at 53; a letter to the editor of a professional journal, *Immuno AG*, 77 N.Y.2d 235; a public community board hearing, *600 W. 115th St. Corp. v Von Gutfeld*, 80 N.Y.2d 130589, N.Y.S.2d 825 (1992); and communications between a union official and a "scab" during a heated labor dispute, *Steinhilber v Alphonse*, 68 N.Y.2d 283, 508 N.Y.S.2d 901 (1986). Most relevant here, and it is

among the first of many bows to come on the changing and challenging mores of the 21st Century, the First Department has noted that "readers give less credence to allegedly defamatory remarks published on the Internet than to similar remarks made in other contexts," particularly "*posted remarks on message boards* and in chat rooms." *Sandals Resorts Int'l Ltd. v. Google, Inc.*, 86 A.D.3d 32, 43-44, 925 N.Y.S.2d 407 (1st Dep't 2011) (emphasis added); *see also Versaci v. Richie*, 30 A.D.3d 648, 649, 815 N.Y.S.2d 350 (3d Dep't 2006) (statement made on an internet public message board, "a forum where people air concerns about any matter," was opinion rather than fact). The *Sandals* court also opined that the fact that an online communication was made anonymously "makes it more likely that a reasonable reader would view its assertions with some skepticism and tend to treat its contents as opinion rather than as fact." *Sandals*, 86 A.D.3d at 44.

The allegedly defamatory statement in this case was made on an internet forum where people typically solicit and express opinions, generally using pseudonyms. The statement was also clearly "rhetorical hyperbole" or a "vigorous epithet," *Gross*, 82 N.Y.2d at 152, particularly when viewed in the context of the heated argument—replete with name-calling—in which Marcano and Brahms had engaged only weeks earlier. Indeed, Marcano made explicit that his comment was a mere allegation, stating later: "Hey, [Brahms] might not be guilty in the long run." (Berland Aff., Ex. 1, at 6.)

Brahms argues that Marcano's statement was "a statement of opinion that implies a basis in facts which are not disclosed to the reader or listener," as opposed

to one that "is accompanied by a recitation of the facts on which it is based or . . . does not imply the existence of undisclosed underlying facts." *Gross*, 82 N.Y.2d at 153 (citations omitted). The two kinds of statements, the New York Court of Appeals has explained, are qualitatively different:

> The former are actionable . . . because a reasonable listener or reader would infer that "the speaker [or writer] knows certain facts, unknown to [the] audience, which support [the] opinion and are detrimental to the person [toward] whom [the communication is directed]." In contrast, the latter are not actionable because . . . a proffered hypothesis that is offered after a full recitation of the facts on which it is based is readily understood by the audience as conjecture.

*Id.* at 153-54 (citations omitted). *See also Sandals*, 86 A.D.3d at 42-43 (email was "pure opinion" in part because "each remark [was] prompted by or responsive to a hyperlink" directing the reader to the facts upon which it was based); *Clark v. Schuylerville Cent. School Dist.*, 24 A.D.3d 1162, 1163, 807 N.Y.S.2d 175 (3d Dep't 2005) ("[A] statement of opinion accompanied by a full recitation of the facts on which it is based will be deemed a pure opinion . . . ."); *Dillon*, 261 A.D.2d at 41 (statement based on facts known to both the declarant and the listener conveyed only nonactionable opinion).

Marcano made the statement at issue, there is no serious dispute, in response to two news articles, posted by a different user, and it was clear that Marcano based his view that Brahms was a "2-bit thief and counterfeiter" on those articles. Marcano even quoted a passage from one article upon which he drew his conclusion. (Declaration of Jason H. Berland in Opposition to Defendants' Motion to Dismiss ("Berland Aff."), Ex. 1, at 1.) No reasonable reader could have inferred from the

posted conversation that Marcano knew additional, undisclosed facts about Brahms that supported his post.[6] Marcano, to be sure, quoted from the article, and it was clear from their prior conversation on VRF that he and Brahms were strangers. In the totality of the ongoing joust, no reasonable reader could believe that Marcano had or purported to have facts about Brahms's conduct other than that reported in the articles.

Despite drawing all reasonable inferences in plaintiff's favor, upon the pleadings and the evidentiary materials properly before the Court, Brahms cannot state plausible defamation claims. Pointedly, in light of the nature of Marcano's internet statement and the context in which it was posted, especially the fact that it was accompanied by the news articles on which it was so obviously based, Marcano's posted comments are protected opinion and cannot be the subject of a defamation action. It follows that no claim can stand against Carver for simply

---

[6] Brahms argues that the charges against him related solely to his use of a forged credit card to purchase luxury shoes, and had nothing to do with counterfeiting. So, he argues, Marcano's statement that Brahms was a "counterfeiter" could not have been based on the news articles discussing charges that were linked to in the December 5, 2011 discussion, but, rather, was intended to imply, without basis in the articles, that Brahms was counterfeiting Rolex watches. Even if the line Brahms attempts to draw between his conduct and the "counterfeiting" described in the articles were justified, no reasonable reader would have drawn the conclusion that Marcano knew of any facts supporting such a statement except those facts disclosed in the articles. Moreover, for the other reasons explained above, the surrounding context makes it clear that Marcano's statement was opinion. In any event, the distinction Brahms presses is not justified. The articles report that Brahms and the others were charged with enterprise corruption, New York's version of federal RICO, N.Y. Penal Law § 460.20, thereby directly linking Brahms to a scheme that allegedly did involve the counterfeiting of credit cards.

republishing Marcano's post. The defamation claims against both defendants are thus dismissed.[7]

## II.    Breach of Contract

Brahms next claims that when he opened up a VRF account, Carver and Marcano entered into a contract with him, and that defendants breached that contract in two ways: (1) by publishing Brahms' e-mail address, eBay username, and other identifying information on VRF, and (2) by failing to remove the information upon request. (Compl. ¶ 43-44.) Specifically, Brahms alleges that defendants breached paragraph 8 of the Network54 TOU, which prohibits users from posting content on Network54-hosted websites that, among other things, "infringes upon privacy rights, such as specific addresses, phone numbers, social security numbers, or credit card numbers." (*Id.* at ¶ 8)

This claim fails to get to the starting gate, which requires that he plausibly allege the existence of a contractual relationship between Brahms and defendants. Setting the rules of the road for its stretch of the internet highway, all users of a Network54-hosted website, such as VRF, must agree to the Network54 TOU in order to create an account. (*See* Berland Aff. Ex. 10 (Network54 TOU).) Thus, in order to become members of VRF, Brahms and Marcano had to agree to the TOU,

---

[7]    As such, it is not necessary to determine whether, in light of Brahms's guilty plea, Marcano's statement was also substantially true. See *Dillon*, 261 A.D.2d at 39 ("Truth provides a complete defense to defamation claims.").

and, likewise, in order to create VRF, Carver had to agree to the TOU.[8] Agreeing to the TOU undoubtedly forms a contract between Network54 and each of its users. (*See id.* at ¶ 1 ("By using Network 54's service . . . you are entering into a contract with Network54 per the following terms of use.")). It does not, however, purport to create a contract between individual users of Network54's services. Brahms does not claim to have any direct contractual relationship with either defendant. Instead, scurrying for the back door, he claims that he is a third party beneficiary of the Network54 TOU, and, thus, can enforce it against Marcano and Carver.

As the parties agree, the Network54 TOU are, by their own terms, governed by California law. (*See* Coogan Aff. Ex. 2 at ¶ 21); *Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 51 (2d Cir. 2004) ("[W]here the parties have chosen the governing body of law, honoring their choice is necessary to ensure uniform interpretation and enforcement of that agreement and to avoid forum shopping."). Under California law, Brahms can enforce the contract as a third party beneficiary only if the contract was made *expressly* for his benefit. Cal. Civ. Code §1559. "If a contract does not clearly evince the intent to benefit a third party, that party is not a beneficiary of the contract." *Northstar Financial Advisors, Inc. v Schwab Investments*, 781 F. Supp. 2d 926, 943 (N.D. Ca. 2011); *E. Aviation Grp, Inc. v.*

---

[8] In his opposition brief, Brahms asserts for the first time that defendants breached a contract between VRF and Network54. Even if VRF is a legal entity, which is far from clear, it is not a party to this action, and Brahms has not alleged that it did or could have agreed to the Network54 TOU. Accordingly, the Court will assume that Brahms alleges breach of the agreements between Network54 and the individual defendants, as the complaint indicates, rather than VRF.

15

*Airborne Express, Inc.,* 6 Cal. App. 4th 1448, 1452, 8 Cal. Rptr. 2d 355 (2d Dist. 1992).

Providing further illumination, a third party is not an intended beneficiary of a contract under California law if he is only incidentally or remotely benefited by it, notwithstanding that the contract, "if carried out according to its terms, would inure to [the third party's] benefit." *E. Aviation Grp, Inc.,* 6 Cal. App. 4th at 1452. "To determine whether a third party is an intended beneficiary or merely an incidental beneficiary to the contract involves 'construction of the parties' intent, gleaned from reading the contract as a whole in light of the circumstances under which it was entered. *Jackson v. Am. Plaza Corp.,* 08-cv-8980, 2009 WL 1158829 at *3 (S.D.N.Y. 2009) (quoting *Hilderman v. Enea TekSci, Inc.,* 551 F. Supp. 2d 1183, 1195 (S.D. Cal. 2008)). For example, a physician was only an incidental beneficiary of a contract between a health care service provider and its enrollees, even though the contract required the provider to make payments to the physician for the enrollees' care, because the intent of the agreement—and the payments— was to benefit the enrollees. *Ochs v. PacifiCare of California,* 115 Cal. App. 4th 782 (2d Dist. 2004) (motion to dismiss); *see also E. Aviation Grp., Inc.,* 6 Cal. App. 4th at 1451-54 (seller's creditor was merely an incidental beneficiary of a contract entered between a buyer and the seller, even though the contract called for the buyer to make payment into an account jointly held by the seller and his creditor).

A recent case offers analysis of the website Craigslist's terms of use, also governed by California law. The court determined that the terms of use were not

intended to benefit—or be enforceable by—third party users. *Jackson*, 08-cv-8980, 2009 WL 1158829. The plaintiff in *Jackson*, a real estate company that used Craigslist to advertise rental properties, sued a competitor for "posting the same advertisements over and over again" in violation of Craigslist's terms of use, which prohibited users from repeatedly posting the same content. *Id.* at *2. Examining the text of the contract and the circumstances under which it was entered into, the *Jackson* court found that the contracting parties had not intended to benefit other Craigslist users when they entered into the terms of use, and, as a result, one user could not sue another for its breach of those terms. The *Jackson* court's analysis is highly instructive.[9]

First, the Craigslist terms of use provided that they would "constitute the entire agreement between [the user] and Craigslist . . . ," which, the court found, demonstrated an intent to create contractual rights and duties only between the two contracting parties. *Id.*

Second, the Craigslist terms of use stated that a user's "*only* recourse upon becoming 'dissatisfied with Craigslist *in any way*' is to cease using Craigslist." *Id.* at *4. The court found that this provision demonstrated an intent to "limit the remedies available to a discontented user and bar that user" from enforcing the terms of use by litigation. *Id.* This conclusion was further supported by an

---

[9] The Court notes that the *Jackson* court was faced with a motion for a preliminary injunction, where the plaintiff faced the heavy burden of showing that he was likely to succeed on the merits of his claim to third party beneficiary status. Nonetheless, that court's analysis of the third party beneficiary claim is certainly relevant here, particularly given that both arise out of internet terms of use agreements.

additional provision that stated "[C]raigslist has the right, but is not obligated, to strictly enforce the [terms of use] through self-help, community moderation, active investigation, litigation and prosecution." *Id.*

Third, the terms of use established an internal grievance procedure, requesting that users report any violations of the terms of use by "flagging the posting(s) for review[] or by emailing . . . abuse@craigslist.org." *Id.* at *5. The *Jackson* court found that this provision "strongly suggest[ed] that "Craigslist did not also intend to endow users with the right to pursue grievances against TOU violators through litigation." *Id.* (citing *Registry.com, Inc. v. Verio, Inc.* 365 F.3d 393, 399-400 (2d Cir. 2004)).

Finally, the court determined that the provision the defendant allegedly violated existed solely for the benefit of Craigslist. The court noted that the highlighted paragraph prohibited repeatedly posting the same content "or otherwise impos[ing] an unreasonable or disproportionately large load on [Craiglist's] infrastructure." *Id.* This language indicated "that Craigslist's principal concern with repetitive posting was that it burdens the Craigslist infrastructure," not that it might hurt other users. *Id.* All in all, the court held, "any benefit received by plaintiffs [was] incidental." *Id.*

The Network54 TOU contain provisions analogous to many, but not all, of those recalled by the court in *Jackson*. First, and importantly, like the Craigslist's terms of use, the Network54 TOU state that they "constitute[] the entire agreement between Network 54 users and Network 54 and supersede[] all prior agreements

and understandings between you and Network 54, " demonstrating an intent to create benefits and duties only between the two parties to the contract. (*See* Coogan Aff., Ex. 2 at ¶23), *Jackson*, 08-cv-8980, 2009 WL 1158829, at *4.

Second, much like Craigslist, the Network54 TOU provide that "[u]sers should report any violations of Network54's terms of use to support@Network54.com." (Coogan Aff., Ex. 2, ¶ 24). This provision "strongly suggests" that the Network54 TOU "did not also intend to endow users with the right to pursue grievances against TOU violators through litigation." *Jackson*, 2009 WL 1158829, at *5.

Finally, the text of paragraph 8 of the Network54 TOU—the provision that Carver and Marcano allegedly violated—indicates that it was created for Network54's benefit, and that any benefit that Brahms or any other user might receive from it was incidental. Paragraph 8, under the microscope, provides a list of content that users are prohibited from posting. In addition to content that is "libelous or offensive to another individual or organization," or 'infring[ing] upon privacy rights," paragraph 8 bars users from publishing content that involves "mail fraud and pyramid schemes," "hatred and racism of any kind," or "unauthorized use or distribution of copyrighted material(s)." (Coogan Aff., Ex. 2, ¶ 8). It is true that in prohibiting its users from posting content that could be injurious or offensive to others, Network54 benefited all of its users, including Brahms. Indeed, it equally benefits all people in the world, whether they are Network54 users or not, who might be targeted by offensive remarks on a Network54-hosted website. This,

however, is the epitome of an incidental, but not intended third party, benefit. It would be unreasonable to infer, consequentially, that in requiring its users to agree to paragraph 8, the Network54 TOU was intended to benefit, as a matter of California contract law, all persons who could potentially be injured by content posted on a Network54-hosted website, and to permit enforcement of the TOU against a breaching user under a third party beneficiary theory. The only reasonable understanding of paragraph 8 is that by prohibiting users from posting offensive or wrongful content, Network54 intended to protect itself from legal liability, providing an incidental benefit to others. The provision that defendants allegedly violated exists for the benefit of Network54, not Brahms or any other Network54 user.

Unlike in *Jackson*, the Network54 TOU do not expressly limit a discontented user's remedies to ceasing use of Network54. *See Jackson*, 08-cv-8980, 2009 WL 1158829, at *4. Notwithstanding, the absence of an explicit limiting provision, alone, does not evince an intent to vest third party users with the right to enforce the TOU. See *Kalmanovitz v. Bitting*, 43 Cal. App. 4th 311, 314 (1st Dist. 1996) ("[T]he contracting parties must *clearly manifest their intent* to benefit the third party.") (emphasis added). Even drawing all reasonable inferences in his favor, Brahms is not a third-party beneficiary of the Network54 TOU under California law.[10] Accordingly, the breach of contract claim is also dismissed.

---

[10] Even if Brahms did have standing to enforce the TOU, he would not have stated a claim for breach of contract. The information that Marcano is alleged to have published—Brahms'

<u>Conclusion</u>

For the foregoing reasons, defendants' motion to dismiss is granted.

The Clerk of Court is directed to enter judgment for defendants and to close this case.

        **SO ORDERED.**

Dated:       **Brooklyn, New York**
               **July 11, 2014**

                                  /s/ ENV

                                  _____

                                  **ERIC N. VITALIANO**
                                  **United States District Judge**

---

first and last name, part of an email address, and his eBay username—is not of the sort prohibited by paragraph 8 of the TOU, which targets "privacy rights, such as specific addresses, phone numbers, social security numbers, or credit card numbers." Additionally, the record clearly shows that at least some of this information was already known to numerous members of VRF, and that Brahms publicly confirmed the information on VRF prior to Marcano's statement. In light of these facts, there was, as a matter of law, no violation of the TOU.